The case for argument today is 2017-2402 Versenius v. Bass Please proceed Mr. Bennett. Good morning Your Honors. May it please the court, John Bennett for the appellant, Versenius Kabi. You state on page 42 of the blue brief that Pseudo showed an 11-fold increase in particulate contamination levels associated with closures treated with silicone to those associated with closures untreated. At table 1, though, Pseudo reports that the peeling quality number for the siliconized stopper is 680. Based on table 1, Pseudo reports finding a total of 680 particles of 10 micrometers per 300 milliliters of water for the silicone and oil treated stopper. Isn't that below the safety limits of both U.S. Pharmacopoeia and the British Pharmacopoeia, which allowed for 3,000 particles for a container of less than 1,000? That is what the board found, Your Honor, and we're not contesting that finding, but the point remains that the board's motivation analysis should not have been limited to whether or purely whether these individual references exceeded certain regulatory limits. Let me direct you to some calculations. Your expert, Dr. Davis, asserted that Pseudo reports a finding of 680 particles of 10 micrometers per milliliter of water for the silicone oil treated stopper. His calculation is off by a factor of 300, isn't it? First of all, I should point out that Dr. Davis initially agreed with our analysis that that was a per milliliter number. I think the reference is a bit unclear as to whether that is or not, but again, we're not contesting the board's finding on that particular point, but again, Your Honor, the point remains that whether or not this exceeds a particular regulatory limit, the person of skill still would not have been motivated to adopt packaging that would have increased the particulate load for this product. Let me ask you some more questions about these calculations. Dr. Davis's analysis of the particulate data resulting from the immersion of 10 stoppers into a container of water did not account for the fact that the number of particulates shed from 10 stoppers would have been 10 times the number of particulates shed from a single stopper in a container, right? So it's off by another factor of 10. Again, we're not contesting the board's finding on that. So you agree that Dr. Davis's calculations are essentially worthless? No. Again, I think that Dr. Feinberg, again, agreed with the per milliliter number that we had proposed below, and it does remain clear if you look at pseudo, I think the plain siliconized stoppers were producing a much higher number of particulates in the solution that was tested than non-siliconized stoppers. And I think, again, whether you agree with the particular... Wouldn't Dr. Davis be off by more than a factor of 10? Because those experiments, you were submerging the whole stopper, 10 whole stoppers in the solution. And in practice, you would never have a situation where the entire rubber stopper is submerged inside the vial, right? Again, we're not contesting, Your Honor, that the numbers as found on the board were correct or off. I'm just correcting Brother Wallach, then. It's not just a factor of 10. Well, it's 10 times 300 times the other mistakes, too. So it's a factor of well in excess. But again, I do think that the clear teaching from pseudo, again, is that you have a much higher number of particulates from a siliconized stopper than a non-siliconized stopper. And as we pointed out in our briefing, the question here should have been whether a person of skill would have been motivated to adopt packaging that would have increased the safety risk with this product, which was, again, an emulsion product that already had a number of globules and particulates in it. Well, Diprovan is an old product, right? And it was already known to put it in a vial. And it was already known to put Diprovan in a vial with a rubber stopper. And so your contribution to the useful arts is putting a silicone on the rubber stopper. Your Honor, there was no evidence, and there is no evidence. I'm just trying to understand the context of the contribution. That is the difference between prior art and Diprovan. Siliconized rubber stoppers, right? I mean, there were many examples of siliconized rubber stoppers. Siliconized stoppers were known, but there is no evidence in the art, Your Honor, that they were ever used with a product like this. And there's very good reasons for that, because, again, it's an emulsion product. It's different from your typical aqueous parenteral product. There was evidence in the art that it stripped silicone from packaging. And it had its own, putting aside whatever the regulatory limits were, it had its own limits. And this is from the Ferranati reference of A412, one of the combination references. It had its own limits on the number, size, distribution of particles, in particular oil droplets, that were acceptable. Because, again, it posed a risk to patients if you had too large and too many of these in the formulation, because it could potentially cause embolism, which, again, was something that was known in the art. Is there a reason why both the United States and British pharmacopoeia standards focus only on 10 micrometer sized particles, or 25 micrometer sized particles, and doesn't address or seem concerned about particle sizes less than 10 micrometers? Right. And I think, again, for aqueous solutions, the concern was particle sizes that were larger because, again, this fear that they could lodge in blood vessels and cause complications with patients. Now, the board, essentially, was unable to determine, based on the teaching of the various references that we point out, as to whether or not a person of skill could have expected a combination, combining the prior art elements would actually meet these regulatory standards. If you look at page 19 of the board's decision, it basically says that it cannot discern from the prior art teaching whether or not the product, this combination, would have met those standards. So, in our view, that is an inadequate basis upon which to find a reasonable expectation under cases like Honeywell. But the real problem, as we point out in our briefing, Your Honors, with what was done by the board below, or at least the primary problem, is its failure to address the sterilization issue that was admitted by a petitioner's expert and their counsel at argument. Namely, that if a person of skill were motivated to combine these elements, they would have to change the known sterilization method for the prior art product, Diprovan, which was known to be autoclaving, a method of applying steam heat, which was an efficient commercial process. Does your claim recite autoclaving as the sterilization technique required? No, but it does recite a sterile composition. Sure, and there were multiple ways of sterilization. Well, again, the undisputed evidence below, Your Honor, was that, A, prior art Diprovan was autoclaved, and there were only two other means of sterilizing parenteral products that were known in the art at the time. One was filtration. That, again, was not appropriate for this product because it's an emulsion. You're hanging your head on this because you have nothing else left. I'm sorry? I said you are hanging your head on this, which is not in the patent, because you have nothing else left. You're saying it's your principal argument. Well, we've made a number of arguments, Your Honor, but this is not our only one. But why the completely erroneous data? Well, Your Honor, again, the points, not just from pseudo, but from a multitude of other references that were relied on by Dr. Davis and others. Menermah has the same errors, doesn't it? Dr. Davis's calculations are just as wrong about that. Well, there was no finding on that, Your Honor, and I don't believe that... The Menermah test measured the number of particulates shed from ten stoppers immersed in 200 milliliters of solution. Dr. Davis didn't do any division there, did he? Well, that may be correct, Your Honor, but again... Well, it either is or it isn't. I will concede that point, but the issue remains, Your Honor, whether or not a person of skill would adopt packaging that was known to increase the particulate load with a product that was known to be sensitive to the number and distribution of particulates because it was an emulsion. When it comes to your auto-claiming argument, the problem I have is the specification of your own 010 patent at column 7, line 31, if I can just read the sentence. The present invention's composition is a sterile aqueous formulation and is prepared by standard manufacturing techniques using, for example, as septic manufacture, sterile filtration, or terminal sterilization by auto-claiming. So to me, it just looks plain that this inventor has contemplated that all three of these different sterilization techniques are interchangeable and they all can be applied equally to the quote-unquote present invention. So again, that's language from the specification. Yes, your patent. It's our patent, but that's not reflective of what's in the prior art, Your Honor, and it was prior art diprovan because it was an emulsion. The patent pertains to a range of different formulations. So you're saying the patent is saying something that's false? No. I'm saying that there are formulations within the patent that are different. Again, the patent pertains to a range of different formulations, some of which may have been capable of being filtered, and this is a reference, again, to sterile filtration. Which would those be? You're saying that it's for sure it can definitely be used for other things that are not your particular claims in question here. Which ones are those? Well, there are a number of low oil formulations, for instance, that are much different from the prior art diprovan product, which was a much higher oil content and emulsion. Does the patent explain that? It does. The patent seems pretty broad when it says the present invention can use any one of these three techniques. Your Honor, again, that's not from the prior art. That doesn't mean what it says is what you're saying. No, I'm saying it pertains to a description of the invention, some of which does not pertain to the precise formulation that was known as diprovan in the prior art. And, again, it was undisputed that the prior art teaching was that you couldn't filter. So your only other option was something called aseptic manufacturing. And, again, the only motivation that was the basis of institution in this case was that you would adopt a siliconized packaging in order to improve the ease and efficiency of manufacturing. And, again, it was undisputed below that you would need to change the sterilization method, and the only method to change it to would be this aseptic manufacturing, which would require an extraordinary amount of expensive and complicated precautions that you'd have to put into place in order to ensure that essentially an entire manufacturing facility was kept in a sterile, contaminant-free environment. That simply doesn't square with a motivation to improve the ease and efficiency of manufacturing, Your Honors. And it was undisputed, again, that the person of skill would need to do this in order to arrive at the prior art combination. So, in our view, that undisputed evidence, which was not addressed by the Board, is problematic legal error under cases like the Polaris Industries case, which found that the Board's failure to address undisputed evidence that would have discouraged the prior art combination was a reason for vacating a Board decision. I also want to touch a bit on the nature of the motivation analysis that was applied in this case. Again, we've discussed this a little bit, Judge Wallach, about whether or not these were the – You're well into your rebuttal time. Do you want to save any of it? I will save. Sorry, Erin. Thank you. Mr. Gonsalves? Good morning, Your Honor. My name is Dr. Gregory Gonsalves, and I'm representing J. Kyle Bass and Eric Spangenberg. May it please the Court, I just want to set a context for what this appeal is about. We know what the appeal is about. Why don't you just get to the merits and address his argument? Sure. And there's only a factual issue as to whether one of ordinary skill in the art would have combined the teachings of the prior art in order to achieve the claimed invention with a reasonable expectation of success. The standard of review of that is that – and this is the Parfum case that I cited in the brief – the presence or absence of a motivation to combine references in an obviousness determination is a pure question of fact. The presence or absence of a reasonable expectation of success is also a question of fact. What a reference teaches and whether it teaches toward or away from the claimed inventions are questions of fact. And a finding is supported by substantial evidence if a reasonable mind might accept the evidence to support the finding. The Board's finding that there was a motivation to combine the prior art references is supported by much more than substantial evidence. The Board reasoned that having considered the full trial record, they were persuaded that a person of ordinary skill in the art would have recognized the advantages of siliconizing rubber closures, such as ease or efficiency during manufacture, would have had a reason to siliconize the bromobutyl rubber closure of DIPRAVAN with a reasonable expectation of success. The patent owner presented no meaningful expert testimony to dispute the Board's finding at Dr. Davis' deposition, which is at page 806 of the appendix. I asked him, do you yourself have experience in filling and packaging of pharmaceutical products, and he said no. He also conceded at page 93 that his calculations were wrong, because I went and got a copy of the DIPRAVAN. That's also correct, and that goes to whether or not I supposedly made it and it was an undisputed admission that you would have had to have changed sterilization methods. I didn't make any such admission. That was one argument of several. In fact, most of the replies, several pages of my reply is directed toward any sterilization method that could be used, including autoclave. And it was directed to the mistake after mistake after mistake that Dr. Davis made when he reviewed the data. So there was no admission that you would have to change sterilization methods. Instead, I argued for several pages that the particulate contamination was well below the limits of the U.S. and British pharmacopoeia, and that Dr. Davis' arguments to the contrary were based upon a flawed analysis of the data. And you went over some of those things. I made it clear in the reply, pseudo. And then the other thing is that the board, as you know, has discretion to determine which expert they're going to find to be more credible. And they reviewed this, the entire record. They reviewed all of the mistakes that Dr. Davis had made. And it's not surprising that over and over and over again, that in the final written decision, they talk about these mistakes. And then they say, we give credit to Dr. Feinberg's testimony and not to Dr. Davis' testimony because of these error after error after error. And so the accusation that the board did not consider the arguments made by Pat and Ona was just false. There are numerous locations throughout the final written decision where the board did consider all of the arguments that were made by the Pat and Ona. And it rejected them because they were based upon an improper analysis. Pseudo, as you indicated before, it's off by a factor of 300. And as you also indicated before at APX-19, the board indicated that the particles that are 10 micrometers in diameter or larger were well below the pharmacopoeia standards of acceptable contamination. And by the way, these pharmacopoeia standards, the British and the US, they were introduced by the Pat and Ona. The Pat and Ona said, look, these are the standards and the data indicates that it exceeds, the contamination level exceeds it. But that's not the case when you look at the analysis you find. It's all flawed. They didn't even read the right number from pseudo. And then the analysis itself was all flawed. They didn't take into consideration that if you have 10 of them, it's going to have 10 times as more particulates. OK. Again, CAPES and Lomax, something that you haven't mentioned, the Pat and Ona relied on CAPES and Lomax, but those were syringes. And just from common sense and as pointed out by Dr. Feinberg, the area in the inside of a cylinder is where the silicone exists is much greater than the area on a stopper that's stuffed into a vial. And because you have more surface area that's been coated with silicone, you're going to get a higher number of particulates. It just doesn't transfer to a stopper that's put in the vial. That analysis was on page 22 of the joint appendix. Page 23 and 24 of the joint appendix, the board also considered the arguments that contaminants of five micrometers or less. You can assume we read it. OK. And also, the other point I'm trying to make is that the board did not misallocate the burden of proof for obviousness. It did mention that these three particular articles, Romberg, This, and Minerma, that the data was ambiguous, but it also, at other locations of its final written decision, on page 19, for example, it said that the pharmacopoeia standard set forth the acceptable number of particles that are 10 micrometers in diameter or larger. And here are the references referring to Romberg, This, and Minerma. Each report data that includes particles that are smaller than 10 micrometers. The board went on to say that we are not persuaded that the data from Minergis and This would have discouraged a person of ordinary skill. OK, well, you know what? We're just reading the board decision. We've all read it. Is there any other argument, if not? Well, the only thing, the purpose of this was just the point that the patent owner's argument that the board did not consider their arguments as false. Because if you look at the final written decision, if you look at the reply that I wrote below, we did contest their arguments. The board did fully consider them. The only other point I'm trying to make is that, that I will make before I sit down, is that the levels of particulate contamination that's not recited in the claim. And also, if you look at the soft copy of the patent and do a search for particulate contamination, you won't find one hit. It's something that was not even mentioned. Unless there are any questions, that would be all. Thank you, Your Honor. All right. Mr. Bennett, you have a little bit of rebuttal time. Your Honor, Mr. Gonzalez went through a number of things that the board addressed in its opinion, but it's not, I don't think it can be disputed, but it did not address this sterilization issue and the admissions that were made on the record regarding that issue. And I know there was some suggestion that the issue was not admitted, but I think if you look at the declaration from Dr. Feinberg, paragraphs 23 to 24 of his declaration, as well as the admissions that were made by counsel below at the oral argument, it's clear that based on the teaching of references like the Thiege 919 patent and the Minerma reference. Cite us to a page where he made an admission that you believe is binding. The declaration references an A879-880, as well as if you look at 8311, which is the trial transcript. So, again, in light of those admissions, we don't think it's possible for the board to have found that there would have been an improvement in the ease or efficiency of manufacture. And if I may, Your Honor, just touch on the obvious. Where's 8311 in the record, in the appendix? Give me a page, because I ordered the entire transcript. Okay. I have it as A311, Your Honor, as the trial transcript. The declaration references A879-880. Okay, got it. And these were cited in our briefs, but if I may just briefly touch on obvious to try, I want to make sure that it's clear that – That's not a concession at all. No, is that a concession? He says, our response to that is, no, you won't, only if you use one particular type of sterilization technique, and there are other sterilizations. That's precisely the point, though, Your Honor, and the follow-up question was, do you agree that you need to show that you need to change the sterilization method to substantiate a finding of obviousness based on this combination? And he said yes. So the point is that if you'd have to change from autoclaving an efficient, less expensive means to a more expensive, more complicated, more cumbersome means of sterilization, like aseptic manufacturing, it undermines the entire rationale for combining the references in the first place. Okay, counsel, we're way over your time, so that concludes our arguments for today. Thank both counsel. The case is taken under submission. Our third case for today.